S99A0079. GEORGIA MARBLE COMPANY v. THERRELL.
(519 SE2d 900)

THOMPSON, Justice.

In this action for an equitable accounting, defendant Georgia Marble Company appeals from the grant of summary judgment and the award of $2,294,607.32 in damages to plaintiff Vinita Therrell; and from the denial of Georgia Marble's motion for summary judgment. Because the trial court applied an incorrect method in calculating Therrell's damages, we reverse.

The salient facts are undisputed. Georgia Marble mines, processes, and sells marble extracted from the Tate Quarries (the quarry). Georgia Marble owns a 65 percent interest in the quarry, and during the period in issue here — December 1988 through February 1995 — co-tenant Therrell owned a 6.25 percent undivided interest. Georgia Marble has mined the quarry since 1884, paying its co-tenants royalties according to an original lease of the property. Shortly before this lease was due to expire in March 1984, Georgia Marble proposed by letter to Therrell that it would continue to pay royalties "in accordance with the formula which is presently provided for in the current lease," subject to an accounting at the option of the joint tenants. Therrell objected to this procedure, claiming entitlement to "her proportional share of the profits, minus [Georgia Marble's] reasonable costs." However, it appears that Georgia Marble continued to follow the prior formula until Therrell sold her interest

in the quarry in February 1995.[1] Thereafter, Therrell brought this action for an equitable accounting.

Georgia Marble extracts marble of two basic grades of quality: non-dimension (lesser quality) stone and dimension (greater quality) stone. The non-dimension stone is crushed and sold; the dimension stone is processed at Georgia Marble's plant and that portion of the product which is suitable for slabs or monumental use is sold. The parties have stipulated to the total amount of marble extracted during the years in question, as well as the quantities of dimension and non-dimension stone. The only issue remaining is the methodology of calculating the value of Therrell's 6.25 percent interest in the quarry during the relevant time period. She asserts that she is entitled to 6.25 percent of Georgia Marble's *profits* for the finished product after sales; Georgia Marble asserts that she is entitled to 6.25 percent of the value of the marble in situ, i.e., the value in its state at the time of extraction minus the costs of extraction.

In granting summary judgment, the trial court applied Therrell's proposed method of calculation and thereby arrived at damages in the amount of $2,294,607.32.[2] While our appellate courts have not had the opportunity to address the method of calculating the value of extracted marble in an action for accounting between co-tenants, we have considered the method of evaluating other extracted minerals in cases involving good faith conversion. We find those cases to be instructive.

In *Zugar v. Crystal Springs Bleachery*, 71 Ga. App. 821, 822 (32 SE2d 414) (1944), a suit to recover the value of coal mined from plaintiff's land, the court approved a jury instruction which assessed the measure of damages for the good faith removal of such coal as " 'the value of the coal after it is taken from the mine or loaded on cars, less the proper expense of such severance.' "

In *Parker v. Waycross &c. R. Co.*, 81 Ga. 387, 396 (8 SE 871) (1889), an action for damages for conversion of timber, the Court calculated damages where the defendant acted in good faith, as "the value at the time of conversion, less the amount which [defendant]

---

[1] Although the lease is not contained in the 1,400 page record submitted to this Court on appeal, the terms of a 1955 lease between Therrell and Georgia Marble are described by the United States Court of Appeals for the Eleventh Circuit in a previous action for equitable accounting between the same parties: "Under the 1955 lease, plaintiffs received $.15 per cubic foot of dimension stone, $.45 per ton for split-face ashlar, and $.05 per ton for 'dump block.' During this period, Georgia Marble sent quarterly royalty statements to each of the Tate heirs detailing the quantity of marble that had been mined." *Therrell v. Ga. Marble Holdings Corp.*, 960 F2d 1555, 1558 (11th Cir. 1992).

[2] We note, however, that in an interlocutory order, the trial court acknowledged that "Therrell possessed [6.25 percent] interest *in the unprocessed marble extracted from the land.*"

added to its value."[3] The rationale for this rule was explained in *Milltown Lumber Co. v. Carter*, 5 Ga. App. 344, 349-350 (63 SE 270) (1908):

> The courts long ago saw that to allow the owner to recover a chattel in its improved condition from one who, innocently or inadvertently mistaking it for his own, had, after converting it, greatly increased its value by labor and expense placed upon it, was a violation of one of the law's cardinal doctrines, – namely, that as against a defendant whose wrong was not accompanied by mala fides, . . . a plaintiff should be allowed only such damages as would justly compensate his actual loss.

Thus, a good faith trespasser who removes minerals from the ground "is usually held only for the value of the mineral in the ground, which as a practical matter normally means the value of the extracted mineral less the trespasser's cost of producing it. . . . In measuring the liability of the good faith mineral trespasser courts have often stated that the recovery is to be based on the value of the mineral in place, that is, its value in the ground before extraction." Dobbs, Law of Remedies (2d ed. 1992), pp. 321-322, § 5.2.

Courts have applied two basic methods in computing damages owed to a non-operating co-tenant in an accounting for the value of minerals removed from the premises by the operating co-tenant. The majority of jurisdictions have adopted a royalty approach which compensates the non-operating co-tenant in proportion to his interest for the value of the ore in place at the mouth of the pit, after deducting the cost of severance. See *Reynolds v. Pardee &c. Lumber Co.*, 310 SE2d 870 (W. Va. 1983) (coal); *Young v. Ethyl Corp.*, 581 F2d 715 (8th Cir. 1978) (brine processed into bromine or sulphur); *National Lead Co. v. Magnet Cove Barium Corp.*, 231 FSupp. 208 (W.D. Ark. 1964) (processed barite ore); see also Dobbs, supra, § 5.2; Annotation, Basis of Computation of Cotenant's Accountability for Minerals and Timber from the Property, 5 ALR2d 1368, 1372, § 5 (1949).

A second method awards the non-operating co-tenant a proportionate share of the net profits realized after deducting from the gross proceeds all reasonable expenses incurred. Id. at 1375, § 6. This method has been criticized because it fails to credit the operating cotenant for his skill, labor, and capital in processing the mineral. And it has long been recognized that a "cotenant, not having shared in the risk, ought not to share in the profits of the operation." Id. at 1370, § 4.

---

[3] Now codified at OCGA § 51-12-50.

*Young v. Ethyl Corp.*, supra, is most instructive. Plaintiff sought and was awarded damages for Ethyl's good faith trespass and removal of brine from plaintiff's fractional share of the mineral field. It was established that plaintiff had no intention or ability to operate his portion of the land or to process the mineral. The district court, nevertheless, awarded the non-operating plaintiff the value of the end products of the brine (i.e., bromine and sulphur), less the cost of production, based on his proportionate share of the field. The Eighth Circuit reversed, observing: "We find no support in the Arkansas cases *or elsewhere* for allowing plaintiff, under the facts of this case, a share of the profits of end products produced from the brine in the proportion which plaintiff's land bears to the entire field." (Emphasis supplied.) Id. at 717-718. Instead, the proper measure of damages was determined to be "the in-place value of the mineral, less the cost of bringing it to the wellhead or the surface." Id. at 718. The Court explained that its objective was to place the injured party in such a position as it would have been had not the injury occurred. Id.

> As to a landowner who has not the opportunity nor the equipment to develop minerals, the amount for which he can lease them, or royalty value, is the generally accepted measure of damages as to him for an innocent trespass and conversion of minerals.

Id., quoting *National Lead Co. v. Magnet Cove Barium Corp.*, supra at 221. See also *Deltic Timber Corp. v. Great Lakes Chemical Corp.*, 2 FSupp2d 1192 (W.D. Ark. 1998) (comparing measure of damages between good faith and bad faith conversion of minerals).

In the absence of a valid contract between the parties, we have looked to the cases involving good faith trespass to ascertain the proper method of calculating damages in this case. See generally *Young v. Ethyl Corp.*, supra (court assessed damages as for good faith trespass looking to terms of an expired lease). This approach is logical because it takes into consideration the distinction between operating and non-operating cotenants, their relative risks, and the nature of the mineral extracted. "In the solid mineral context, this translates to the value of the mineral at the mouth of the mine, less costs of mining." D. Thompson, Thompson on Real Property, p. 184, § 48.06 (a) (1994). Accord *Reynolds v. Pardee &c. Lumber Co.*, supra; *Young v. Ethyl Corp.*, supra; *National Lead Co. v. Magnet Cove Barium Corp.*, supra. We hereby hold that Therrell's damages are to be calculated by determining the value of her fractional share of the marble at the time of extraction, less the costs of severance.

Accordingly, the judgment of the trial court is reversed and the case is remanded for further proceedings in light of the application of

this method of calculating damages.
*Judgment reversed. All the Justices concur.*

DECIDED JULY 6, 1999.

*Greene, Buckley, Jones & McQueen, John D. Jones, John E. Talmadge,* for appellant.
*Wood & Meredith, Hugh C. Wood, Dwight A. Meredith,* for appellee.